UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

ROBERT LEROY McCOY                CIVIL ACTION NO. 08-cv-1918

VERSUS                            JUDGE HICKS

CRAIG STOKES, ET AL               MAGISTRATE JUDGE HORNSBY

**REPORT AND RECOMMENDATION**

**Introduction**

Robert Leroy McCoy ("Plaintiff") is awaiting trial in Bossier Parish on charges that he killed his estranged wife's parents and her 17 year old son. Plaintiff was arrested in Idaho. A Nez Perce County jail log states that Plaintiff attempted to commit suicide in his cell by using a bed sheet to hang himself. Deputies and medical professionals were able to revive Plaintiff, and he was extradited to Bossier Parish, where he is now housed at the Bossier Parish maximum security jail awaiting trial on the murder charges. Plaintiff has attempted suicide at least twice since his return to Bossier Parish.

Plaintiff filed this pro se complaint against Bossier Parish Sheriff Larry Deen, Warden Craig Stokes, Deputy Robert Parker, and Deputy Daniel Talley. Plaintiff alleges in his complaint that he was subjected to an episode of excessive force and that his medical care has not been appropriate. Before the court are Defendants' Motion to Dismiss (Doc. 21) and Motion for Summary Judgment (Doc. 24).

**Motion for Summary Judgment**

    **The June 8, 2008 Medical Incident**

Plaintiff alleges in his complaint that on June 8, 2008 he was taken from the jail to the hospital at LSU-HSC for what Plaintiff describes as a bleeding ulcer. He alleges that "the facility" informed the hospital that they believed Plaintiff had swallowed razor blades. Plaintiff alleges that examinations with a camera tube inserted in his stomach and colon proved that the deputies at the jail were wrong. Plaintiff was released back to jail after four days in the hospital.

Warden Stokes testifies by affidavit that Plaintiff attempted suicide on June 8, 2008 by ingesting the jagged, broken plastic cover to a disposable razor after cutting both of his arms. Plaintiff was found in his observation cell in a large amount of blood and feces. He was immediately transported to LSU-HSC where he received treatment for blood loss until his discharge four days later. Photographs attached to Stokes' affidavit depict the plastic razor cover and a bloody mess of a cell. Nurse David Gorman testifies by affidavit that Plaintiff received, during his stay at the hospital, blood transfusions, medications, and lab work to treat his condition.

For a convicted prisoner or pretrial detainee to prevail on a claim that his medical care (or lack of care) violated the Constitution, he must prove that prison or jail officials were "deliberately indifferent" to his "serious medical needs." Estelle v. Gamble, 97 S.Ct. 285, 291 (1976); Hare v. City of Corinth, 74 F.3d 633, 643 (5th Cir. 1996) (en banc). Deliberate

indifference encompasses only unnecessary and wanton infliction of pain repugnant to the conscience of mankind. Estelle, 97 S.Ct. at 291-92. Disagreement with the diagnostic measures or methods of treatment afforded by prison officials does not state a constitutional claim for indifference to medical needs. Norton v. Dimazana, 122 F.3d 286, 292 (5th Cir. 1997).

It is not clear whether Plaintiff attempts to state a claim based on his visit to the hospital on June 8 or whether it is simply part of his continuing allegations that he has never attempted suicide. Plaintiff reasons that he would not make such attempts because he is innocent of the crimes with which he is charged. The summary judgment evidence shows that the jail officials properly responded to a serious health emergency by immediately transporting Plaintiff to the hospital. Even if the cause of the emergency was a bleeding ulcer rather than a suicide attempt, officials did not act with deliberate indifference by immediately sending Plaintiff to the hospital.

Plaintiff alleges that unspecified persons at the jail informed the hospital that Plaintiff had swallowed razor blades, an assertion that Plaintiff says proved false. The evidence shows that there was an indication in the cell that reasonably prompted the jail officials to convey that warning to the hospital. Whether the belief that Plaintiff had swallowed a razor blade proved true or not, the allegations do not suggest that any named defendant acted with deliberate indifference to a serious medical need in connection with this incident. Defendants

should be granted summary judgment with respect to any claims based on medical care following the June 8, 2008 incident.

**Medical Problems with Leg**

Plaintiff alleges in his complaint that on June 13, 2008 he was in the shower area when he was subjected to an episode of excessive force. The claim based on that event will be addressed in a separate section below. Plaintiff alleges that in the hours after the shower incident he noticed his leg swelling from the top of his thigh to the tip of his toe. Plaintiff alleges that he pressed an emergency button several times with no response, although a deputy eventually came to the cell to check on him. Plaintiff asked to see the nurse but was told the nurse was gone for the day. Plaintiff then asked the deputy to look at his leg. Plaintiff alleges that the deputy did so and immediately called nurse David Gorman, who came to examine Plaintiff's leg.

Plaintiff alleges that he told nurse Gorman that his leg had been that way for the past three hours. Nurse Gorman allegedly called for an EMT to look at the leg. The EMT reported that the leg was swollen but had a good pulse. A couple of hours later, Plaintiff alleges, Plaintiff's leg was three times the size of his other leg and he again called for assistance. Nurse Gorman allegedly returned, saw the leg, could not find a pulse, and immediately told deputies to transport Plaintiff to the hospital.

Plaintiff alleges that hospital workers eventually found a weak pulse in his leg, but the leg continued to increase in size, cause pain, and become numb. Plaintiff alleges that he was

found to have a blood clot from his waist area to the bottom of his thigh, as well as a clot behind his knee and another by his ankle. Plaintiff alleges that he was admitted to the hospital, given continuous medicine for three days, and released with blood thinner pills that Plaintiff alleges he will have to take for the rest of his life.

The Plaintiff's allegations with respect to this medical problem are not directed at any named defendant. Plaintiff does not fault Sheriff Dean, Warden Stokes, Deputy Parker, or Deputy Talley for any delay associated with medical care for the swelling leg. Nurse Gorman is not a named defendant, but by Plaintiff's allegations Gorman acted promptly and reasonably in response to the alleged medical condition. Accordingly, Plaintiff has not alleged facts to suggest that any defendant was deliberately indifferent to a serious medical need with respect to this alleged medical condition. All claims based on delay or other aspects of the medical treatment of the leg should be dismissed.

**Medical Problem With Eyes**

Plaintiff alleges that, after his return from the hospital for the blood clot matter, he was placed in a holding cell with a cloth gown, where guards harassed him. A week later, a guard allegedly sprayed Plaintiff with mace as Plaintiff slept on the floor. Plaintiff alleges the mace stayed on him for two days and swelled both of his eyes.

Plaintiff alleges that his eyes became worse and he was taken to the hospital. Plaintiff alleges that deputies threatened Plaintiff not to tell the truth, and the deputies told a doctor that Plaintiff had an allergic reaction to his blood thinner medication. Plaintiff alleges that

he received an eye examination and was released back to jail. He alleges that his eyes continued to be bloodshot and swollen for some time afterwards.

Plaintiff does not specify in his complaint, or in any of his many other filings, the name of the deputy who allegedly sprayed mace on him as he slept on the floor. Plaintiff alleges that a Lt. Wick (not a named defendant) was the one who threatened him not to tell the truth about the cause of his medical problem. Plaintiff nowhere alleges that any named defendant participated in the events just described.

Nurse Gorman testifies in support of the motion for summary judgment that he is aware that Plaintiff has been seen twice at LSU-HSC for evaluation of his eyes. The first visit was July 15, 2008. The physician indicated that Plaintiff had bilateral subconjunctival hemorrhage that the physician expected to resolve in two weeks. The physician noted in the records that he questioned whether the condition was caused by the patient. Plaintiff was seen at LSU-HSC again on August 15, 2008. The physician indicated that there were no further subconjunctival hemorrhages and that Plaintiff should continue with medication previously prescribed.

Plaintiff has filed several items subsequent to the filing of the motion for summary judgment, and the court has reviewed each of them to determine whether they included any competent summary judgment evidence relevant to the claims alleged in the complaint. Plaintiff has offered no evidence regarding his eye claims. Neither the allegations in the complaint nor the summary judgment evidence submitted by Defendants provide any basis

for a claim of excessive force or denial of medical care against any named defendant. Summary judgment should be granted to dismiss all claims based on Plaintiff's allegations regarding his swollen and bloodshot eyes.

### Third Suicide Attempt

Defendants included in their summary judgment evidence an account of a third suicide attempt committed by Plaintiff on July 28, 2008. Affidavits and medical evidence indicate that Plaintiff bit a large area out of his right arm. The medical report states: "Patient tried to gnaw off his arm." Plaintiff was taken to the hospital for surgical repair and treatment.

Plaintiff, in his several filings after the motion for summary judgment, has denied that he made a third suicide attempt. He asserts that the wounds to his arm were caused by a Taser. The court need not delve further into the facts surrounding this incident because Plaintiff's complaint does not attempt to set forth any claim against any defendant based on events around this alleged suicide attempt.

### The June 13, 2008 Shower Incident

#### A. Allegations in Complaint

Plaintiff alleges in his complaint that on June 13, 2008 Warden Stokes and two deputies escorted Plaintiff to the shower area. Plaintiff alleges that he told Stokes that some of the deputies were threatening him, but Stokes told Plaintiff to shut-up because he did not want to hear that. Later, after Stokes left the area, Deputy Daniel Talley entered the shower

area and started calling Plaintiff derogatory names, spit in Plaintiff's face, and otherwise tried to provoke Plaintiff.

Plaintiff alleges that Deputy Talley then ordered Plaintiff to put his hands behind his back and walk out the door of the shower. Plaintiff alleges that he proceeded to do so, but did use his right hand to open the door. At that moment, Plaintiff alleges, Talley grabbed Plaintiff's left arm and held it high in the escort position. He tried to pull Plaintiff back into the shower area so he could assault Plaintiff where there were no cameras recording the events.

Plaintiff alleges that Talley eventually slipped, fell, and pulled Plaintiff on top of him. Plaintiff alleges that he immediately placed his hands behind his back so the cameras would record that he was not the aggressor. Plaintiff alleges that two deputies in the area grabbed Plaintiff and handcuffed him while Deputy Talley repeatedly punched Plaintiff in the face. Plaintiff alleges that, while in handcuffs, he put his head down on the floor in an effort to stop Talley from hitting him in the face. He saw defendant Robert Parker and several other deputies running toward him. Parker allegedly used a Taser device on Plaintiff's leg. Two other deputies pulled Plaintiff's handcuffed arms and sprayed him in the face with mace. Parker then used the Taser on Plaintiff's chest area two times. Parker then jerked Plaintiff up by his handcuffs and threw him in a holding cell. Plaintiff alleges that nurse David (Gorman) came to see him but left Plaintiff in the room with mace on his face and naked body.

### B. Defendants' Affidavit Testimony

Defendants submit affidavits that offer a version of the events that differs from that asserted in the complaint. Warden Stokes testifies that Plaintiff was in the shower and told Stokes that he was going to have to take matters into his own hands. Stokes testifies that he told Plaintiff to follow the orders of the deputies and remain calm. Deputy Chase Townley testifies that he was in the shower area to observe Plaintiff, who was on suicide watch. Plaintiff was being aggressive verbally and making derogatory remarks and saying that he would take matters into his own hands. Townley testifies that, after Plaintiff finished his shower, Townley tossed a towel to Plaintiff. Plaintiff let the towel drop to the floor and then said that the deputies were being disrespectful to him. Talley testifies that he told Plaintiff that nothing was meant by the tossing of the towel, so Plaintiff should just pick it up and dry himself.

The corrections officers testify that an inmate is told from the day he arrives that he is to walk with his arms and hands behind his back when moving from one area to another. This prevents any appearance of a threat to deputies. Deputy Talley instructed Plaintiff to place his hands behind his back for an escort back to his cell, but Plaintiff refused. Deputy Talley testifies that he began to place Plaintiff in the escort position, but Plaintiff aggressively spun around and placed Talley in a compromising position with his back to the

inmate. Talley testifies that he and Plaintiff began to struggle, and Plaintiff pushed Talley from the shower room and about 10 or 15 feet across a hallway before Plaintiff landed on top of Talley.

Talley testifies that he continued to struggle to bring Plaintiff under control, but Plaintiff constantly resisted, and Plaintiff defied orders to stop struggling and place his hands behind his back. Talley testifies that Plaintiff locked one arm in an outward position and tucked the other securely under his body. Talley said he used open-handed strikes in an attempt to control Plaintiff, who was wet and naked, making it difficult to grasp him.

Talley testifies that other deputies saw his predicament and came to the area to assist. He testifies that Warden Stokes responded by using chemical spray, which appeared to have no effect on Plaintiff. Deputy Parker then administered a dry stun with a Taser device. Deputy Parker testifies that he used the Taser in dry stun mode to administer local pain to an area of the body to bring the prisoner under control. He used a total of three five-second stuns. Before the third stun, Plaintiff continued resisting and would not follow orders. After the third stun, Plaintiff began to comply and allowed himself to be handcuffed.

Deputy Parker testifies that the nurse was present during the altercation and that Plaintiff was immediately assessed and escorted to his cell by Parker and the nurse. Plaintiff was allowed to calm down and, within 30 minutes, the nurse reassessed Plaintiff in the infirmary. Parker testifies that he did not see any injuries to Plaintiff. Nurse Gorman offers similar testimony and also notes that he did not find any injuries to Plaintiff. Gorman adds

that he never saw any force used on Plaintiff after the handcuffs were applied by the deputies.

### C. Plaintiff's Summary Judgment Evidence

After Defendants filed their Motion for Summary Judgment, Plaintiff tendered several filings that, generously construed, are intended as opposition to the motion. See Docs. 27, 29, 34-40, 43-45, 48, and 49. Some of the submissions are unsworn memoranda, which are not competent summary judgment evidence. Larry v. White, 929 F.2d 206, 211 n.12 (5th Cir. 1991). Many of those filings have little or nothing to do with the allegations in the complaint. Rather, Plaintiff complains in them about what he believes is a conspiracy theory behind efforts to convict him of murder.

Several of the filings, including Plaintiff's complaint, contain a declaration by Plaintiff that they are made under penalty of perjury and that all statements made therein are true and correct. Such declarations, made in substantial conformity with 28 U.S.C. § 1746, may be competent summary judgment evidence. Hart v. Hairston, 343 F.3d 762 n.1 (5th Cir. 2003). Most of the filings that contain a declaration pursuant to Section 1746 are, however, not relevant to the claims asserted in the complaint. Plaintiff talks about an attack on another inmate by a non-defendant deputy, asserts that a non-defendant deputy has engaged in unlawful sexual conduct with juveniles, complains about his criminal proceedings, and the like.

Only one of the submissions, Doc. 29, contains both a declaration pursuant to Section 1746 and some contentions that are pertinent to the allegations in the complaint. But even this document contains delusional assertions, including: a conspiracy between the Bossier Sheriff and the FBI regarding an incident where a police officer was found sleeping with Plaintiff's wife; efforts by Pamela Smart, his court appointed attorney in the murder case, to withhold evidence and deny him equal protection; plots and schemes to make Plaintiff look guilty; and starving Plaintiff by withholding food and water. Plaintiff also denies that he has ever attempted to commit suicide, and he proclaims his innocence of the criminal charges.

Plaintiff also makes some conclusory assertions relevant to his Section 1983 claims. Plaintiff asserts that "they" tore his suicide paper yellow gown from him as they tried to pull him back in the shower area to assault him outside the view of security cameras. Plaintiff states that he "never became aggressive" and was never "on my back" resisting. Plaintiff states:

> Captain Stokes, Chase Townley both sprayed me with mace while on my knees, Deputy Talley striking me in the face closed fist, with my hands visually behind my back and laying my head at rest on the floor to avoid striking blows by Deputy Talley. ...
>
> Deputy Wilson, never opened the shower door, I opened shower door with my right hand and while my left hand was still behind my back, Deputy Talley grapped it put it high in a escort position, etc....
>
> I was handcuffed when Deputy Parker started Tasing me.

### D. Analysis and Conclusion

The claims of pretrial detainees are assessed under the due process clause of the Fourteenth Amendment rather than the Eighth Amendment's cruel and unusual punishment clause, which applies to convicted prisoners. But when a court is called upon to examine the amount of force used on a pretrial detainee for the purpose of institutional security, the Fifth Circuit adopts Eighth Amendment standards. The question is whether the measures taken inflicted unnecessary and wanton pain and suffering, which depends on whether the force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically for the purpose of causing harm. Valencia v. Wiggins, 981 F.2d 1440, 1446 (5th Cir. 1993).

Plaintiff's allegations of fact in his verified complaint and the additional bits of evidence scattered throughout at Doc. 29 are not sufficient to create a genuine issue of material fact as to whether Warden Stokes, Deputy Parker, and Deputy Talley ran afoul of that standard. Defendants offer evidence that Plaintiff refused their instructions, and Plaintiff admits that he reached out his right hand when he was supposed to remain in the escort position with his hands behind his back. Defendants offer evidence that they employed only that force necessary to gain control of Plaintiff and the situation. Plaintiff urges that the force was of an unlawful degree under the circumstances, but he submits only conclusory (and carefully worded) assertions that he never "became aggressive," that he was never "on [his] back resisting," and that he was handcuffed when Deputy Parker started tasing him.

While the court may not weigh the competing evidence or make any credibility assessments in this summary judgment contest, <u>Harvill v. Westward Communications, L.L.C.</u>, 433 F.3d 428, 436 (5th Cir. 2005), a party may not defeat a motion for summary judgment with conclusory allegations or unsubstantiated assertions. <u>Little v. Liquid Air Corp</u>. 37 F.3d 1069, 1075 (5th Cir. 1994). The court finds that a reasonable juror who considered the few specific facts offered by Plaintiff, together with the aspects of the Defendants' comprehensive summary judgment evidence that are not contested, could not return a verdict that any named defendant used force maliciously and sadistically for the purpose of causing harm rather than in a good-faith effort to maintain or restore discipline. Accordingly, summary judgment should be granted for Stokes, Parker, and Talley with respect to this claim.

**Sheriff Larry Deen**

Plaintiff also has not created a genuine issue of material fact with respect to any claim against Sheriff Larry Deen. Plaintiff never mentions Deen in his complaint or summary judgment submissions as playing any role in the events about which Plaintiff complains. Deen has submitted an affidavit in which he testifies that he had no direct involvement in the incarceration of Plaintiff and was not aware of any violations of Plaintiff's rights. Plaintiff has not presented evidence to create a genuine issue of material fact with regard to Deen, so Deen is entitled to summary judgment.

**Plaintiff's Motion for Injunctive Relief**

Plaintiff has also filed a Motion for Preliminary Injunction (Doc. 31) in which he asks the court to order the defendants to provide the court a copy of the "camera evidence" that Plaintiff proposes will back his allegations regarding the June 13, 2008 incident in the shower. Given the recommended resolution of Defendants' Motion for Summary Judgment, Plaintiff's request for injunctive relief should be denied as moot.

**Defendant's Motion to Dismiss**

Defendants filed a Motion to Dismiss based on Plaintiff's failure to comply with a court order that required Plaintiff to respond to Defendants' interrogatories and requests for production of documents. Because the court should grant summary judgment (as set forth above), it is not necessary to address the motion to dismiss. The motion should be denied as moot.

Accordingly;

**IT IS RECOMMENDED** that Defendants' **Motion for Summary Judgment (Doc. 24)** be **granted** by dismissing all of Plaintiff's claims.

**IT IS RECOMMENDED** that Plaintiff's **Motion for Preliminary Injunction (Doc. 31)** be **denied as moot**.

**IT IS FURTHER RECOMMENDED** that Defendants' **Motion to Dismiss (Doc. 21)** be **denied as moot**.

**Objections**

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b). A party may respond to another party's objections within seven (7) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within fourteen (14) days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED in Shreveport, Louisiana, this 5th day of January, 2010.

_____
MARK L. HORNSBY
UNITED STATES MAGISTRATE JUDGE